The next matter is Anthony M. v. Lester Wright, M.D. and others. Thank you. Thanks. Long day. Long day. No, I just said long day. Well, for a minute more, good morning. Good morning. My name is Dan O'Brien. I'm an attorney from Rochester, New York. And this case brings up for determination the question of whether or not the enhancement of the security regime during my client's civil trial posed an unacceptable risk of impermissible factors coming into play and which essentially prejudiced his rights and deprived him of due process. Counsel, your client signed his papers with his real name. Can we use his real name? We can, Your Honor. It's in a number of decisions. His name is Anthony Medina. I just want to make sure. Okay, continue. This is an appeal from a judgment of the district court following a jury verdict in favor of the three individual defendants, all employees, of the New York State Department of Corrections and Community Supervision, which we will refer to as DOCS. The action below was commenced by Mr. Medina, an inmate, and he asserted his claim under 42 U.S.C. Section 1983, alleging that DOCS personnel failed to provide him with adequate medical care. In particular, Mr. Medina had been diagnosed with gynecomastia, or enlarged male breasts. His symptoms included pain, discomfort, swelling, the development of lumps underneath his nipples, chafing and irritation, and discomfort, which was heightened in cold weather. This diagnosis is spread across the record and is not in serious dispute. The plaintiff sought surgery to address the condition, and it was the refusal by DOCS medical professionals to afford him this treatment that led to the action. Now, the record also reflects that Mr. Medina suffers from photophobia, secondary to his keratoconus, a cornea disease, and it results in intense sensitivity to light, which can cause pain, headaches, vertigo, nausea, and such, when he is exposed to light for prolonged periods of time. Now, great pains were taken in advance of the trial by Judge Geraci, the chief judge of the Western District who presided over the trial, and by me, plaintiff's trial counsel, to ensure that Mr. Medina was properly medicated and otherwise prepared for trial so he could meaningfully participate in the trial. And we submit that DOCS, either willfully or with reckless disregard for his rights, undermined his readiness and rendered him incapable of supporting his own case at trial. Ignoring Judge Geraci's pretrial order, personnel at Wendy failed to give him time to shower and shave the first morning of the trial, failed to bring his reading device to the courthouse, and most importantly, did not give him appropriate medication, notwithstanding a then-operative injunction issued by Judge Preska from the Southern District that he be given a drug called Ultram, quote, or an alternate but equally effective medication, close quote, to treat his photophobia. Can you tell me why that suit was brought in the Southern District? Because I believe at the time he was housed in a facility within the Southern District. On the first day of the trial, as it wore on, the plaintiff became ill and more symptomatic. By 1 p.m. he was in obvious distress, and by 2.55 p.m. he had vomited several times and told his transport team that he was sick and needed to go to the hospital. When Judge Geraci questioned him, he said, quote, I am in so much pain I am trying to go to the hospital. This wasn't in front of the jury. No, the jury had been excused. Because one of the defendants, Holly Collette, was only available that first day of the trial, the trial went forward in Mr. Medina's absence. And although the record was never really well developed, there was some sort of an incident as he was being transported back to Wendy Correctional Facility. All we know about what happened and all that's on the record is what Judge Geraci reported based upon what he had been told. There was no fact-finding hearing or no inquiry, no interviewing of any of the actual participants other than my client, who clearly blamed whatever happened on his illness and the pain he was in and his lack of proper medications. He took extra medication. Medication which, on the record, one of the corrections officers said was caffeine and it turned out to be a barbiturate. The next morning, the second day of the trial, the three unarmed and inconspicuous corrections officers from Wendy were replaced by five armed members of an elite SWAT-type force dressed in armored vests. What had happened in the van? Well, I don't think that there's any dispute that he either kicked out, a window was knocked out of the van either by his head or kicking it, and there was some foul language used, but we really never know because my client did not recall precisely what happened given his condition and none of the people who were in the van were brought in and questioned on the record. So we don't really know other than it was obviously treated as a serious event on my client's part because, as I say, the next day, instead of the three corrections officers from Wendy who were unarmed, we had five armed officers with Kevlar vests. Is it true that the only thing that Medina asked was that the guards disarm? That morning, I complained about the enhanced security, and the judge said he brought this on himself. I thought the best I could do was to ask them to at least take their sidearms off and not have them in the courtroom, and the judge refused to do that. So our position is that because of the failure to properly medicate him, this incident happened, and it's not just my opinion, Your Honor. The disciplinary proceeding that was instituted as a result of this incident, they found against him administratively. It was set aside by the Supreme Court justice on an Article 78 proceeding. But more importantly, Judge Preska had a contempt hearing in late 2017 or early 2018 and issued a 92-page opinion and found that DOCS was in contempt for not providing Mr. Medina with a proper alternate medication to the Ultran, and in fact made particular reference to the failure to provide him with appropriate medication in advance of this trial. She said that DOCS medical personnel, quote, willfully denied Mr. Medina effective pain treatment for his court appearance, meaning in Rochester for this trial. The government has not appealed that, and I believe that that would be binding on not only DOCS, but . . . So it goes to fault? Yes. I think it undermines Judge Geraci's finding that he brought this on himself and to the contrary suggests that DOCS was responsible for this incident, and therefore he was deprived of a fair trial through no fault of his own, and that's . . . This was not a criminal case where the presence of things like restraints or unusual security undermines a presumption of innocence and could prejudice the jury. This was a civil case involving a man who was incarcerated in a penitentiary. I mean, what's the prejudice here? Well, the prejudice is that when in the middle of a trial, you go from having three inconspicuous corrections officers who were not particularly imposing, and the second day you have five uniformed officers with Kevlar vests and side arms, all of whom were probably six foot two or taller, and no explanation, the only thing the judge would do is give a very generic charge saying, you're not to speculate as to the reason for security. Now, they can understand why the corrections officers are going to be there, but they're only going to speculate about why in the middle of the trial we have five of these people there, one in every corner and then one seated. The jury is bound to speculate, and remember, this is a guy who's legally blind. He was sick the afternoon of the first day of the trial. So I believe, Your Honor, that the only inference that could be drawn is that the jury is going to think that this is a very dangerous man and has to be restrained or restraint has to be imminent and available, or else the courtroom might be erupting in disorder or they might be harmed. Thank you. I have two minutes reserved for rebuttal. We'll hear from the State. May it please the Court. May it please the Court. Zainab Chaudhry for the defendants. Judge Parker, let me start with your last question. There is no prejudice here, and this is not like where physical restraints are being used. So unlike in that case, the use of uniformed officers is not inherently prejudicial. Well, it's a continuum from shackles to five armed guards. It's a continuum, isn't it? It is a continuum, but the Supreme Court— And the question is whether five armed guards with Kevlar vests in full uniform is prejudicial. That is the question, Your Honor, and it's not in this case. This Court and the Supreme Court have held that the use of armed and uniformed guards is not inherently prejudicial so that actual prejudice must be shown. There's no evidence in the record to support that, and the District Court did make a determination that was individualized here. It had, of course, before and during the trial made extensive accommodations for plaintiff's disability, including turning off 80 percent of the courtroom lights, offering to adjourn the proceedings, which the plaintiff rejected. And here really took other steps to minimize any possible prejudice, like curative instructions to the jury about plaintiff's custodial status and the lighting and the like. And it also did grant counsel's alternative request. Judge Pooler, there was an alternative request that the guards be seated if they were not going to be disarmed, and they were. They were seated? They were seated. The judge did permit that. If I could address Judge Preska's decision. The state, of course, disagrees with the decision and are reserving a right to appeal. The time has not started running because Judge Preska did not actually assess the final amount of damages and to whom the contempt damages would apply, so there's no appealable order yet. But regardless of what— Is the state going to appeal that, to the best of your knowledge? My understanding is we are considering that as an option once a final appealable order is issued in that matter. But regardless of what caused plaintiff to become violent, even if we assume that Judge Preska's findings are correct and if they were not appealed and affirmed by this court, even assuming it was a medical or medication issue, that does not make the district court's ruling an abuse of discretion because there is no question that he engaged in the violent conduct that occurred as counsel here has conceded. And even Judge Preska, in her decision, found that the plaintiff acknowledged smashing out the van windows after the trial. So the district court had to exercise its discretion. Did it acknowledge that? Is that in the record? It's in Judge Preska's decision and it's in the record there. And what's in our record here is that there was no dispute raised about the fact of that occurring. It was—the dispute was about what the reason for that occurring was. No factual hearing as to what happened in the van was there? There was just Judge Gerasi and unobjected to his statement about what happened, right? There was not a hearing, Your Honor. That's correct. But there was a significant colloquy the judge had with both the plaintiff and plaintiff's counsel where there was no dispute raised as to the facts of the violent incident. And so where there's not a material question of what occurred, a hearing need not be held. But in any event, he did conduct— Was there a request for a hearing? There was not a request. No request for a hearing. Not that I—my recollection of the record is that— No dispute about the fact of the breaking out of the window. Right. That's right. There was no dispute about that. And so in that circumstance, under such a serious concern that was presented, the trial judge had to do something to protect the security of the courtroom and those in it. And, you know, whatever the cause of that may have been. And the PI in place at the time did provide for alternative medications that could be effective to be used. It was not fully determined and resolved by Judge Preska at that time. There was still continuing litigation going on in the Southern District about what medications those could include. So the judge had the most current information and made a reasonable, balanced decision under the circumstances. Again, giving the cautionary instructions and providing additional protections against any possible prejudice. But even assuming there were to be any error that this Court would find, we submit that it was harmless and that there's no reason to believe in the record that the presence of the armed officers affected the verdict at all, most importantly because the evidence in defendant's favor was overwhelming. There's no reasonable jury that could have found plaintiff established defendants were deliberately indifferent to a sufficiently serious medical need that produced, in his case, extreme pain. The medical staff agreed that plaintiff's condition was benign and was not medically— Plaintiff did not call a medical expert to contradict that judgment. Even the nurse, Nurse Northrup, whose testimony plaintiff relies on extensively in his brief, also said that surgery might not be appropriate and she didn't know if it were to be appropriate. And plaintiff's own testimony established that his pain was sporadic and did not prevent him from participating in daily activities and even sports. He said he was harassed and assaulted because of this condition. Yes, but that goes to exactly the heart of it, that he wanted it for that reason, for a cosmetic reason. He wanted it not to be assaulted. Isn't that a legitimate reason? Your Honor, it's legitimate to not want to be assaulted, for sure. But whether a surgical procedure with its own risks and complications is medically necessary is a very different question. And he told the jury that the issue of his pain and discomfort to the extent that he felt that was secondary and, you know, primarily for the appearance of it because it led to that harassment. There are other factors in the harmless error analysis, of course. The need for additional security measures did not go to the underlying substantive question on the medical indifference claim. The underlying issues did not hinge on the plaintiff's credibility. And again, the district court took the additional precautions to minimize the prejudice, the cautionary instructions granting the request that they be seated. And there's no evidence in the record either that the weapons were visible, even visible to the jury. So unless the court has any further questions. What do you mean there's no evidence they were visible? They were armed, right? Yes, there's no record evidence that the jury, that because they were seated, that their armed arms, excuse me, weapons could be viewed by the jury. You were not there, but Mr. O'Brien was there in the courtroom, right? So we'll ask him when he comes back to the podium. That would be his recollection, yes. But it's not reflected in the transcript, Your Honor, is what I meant to say. I appreciate that. Thank you. Thank you, counsel. Mr. O'Brien, you tried this case, right? I did, Your Honor. So could you see the guns? They were clearly visible to me, and they were not seated the entire time during the entire proceeding. And, indeed, my recollection is that there was no way anybody sitting on the jury could not perceive the fact that they were armed. They were there, as I say, in their SWAT-type uniforms, and that was patently obvious. They were in full uniform, right? Correct. Now, I just want to address a couple of quick points. There was no agreement or stipulation or outright determination, express determination, as to what happened in the van. There was some statements by Judge Geraci on the record as to what he was told, and there was some questioning of my client. But it was by no means established that something had happened, that my client was responsible. You didn't ask for a hearing on it. Pardon me? You didn't ask for a hearing on it. I didn't ask for a hearing, but I stated my objection, I think, fairly persuasively as to why I thought it would be prejudicial to my client, and I challenged his assertion that my client brought this on himself. Yes, but you didn't ask for a hearing on whether your client committed acts of violence of breaking out the window in the van. Your Honor, I— You didn't say that there was a dispute about that.  You disputed the cause of it. You disputed the reason for it, but you didn't dispute the fact that it happened. I did not dispute the fact that something happened, but it was never clear on the record what did happen or even what the judge was basing his decision that my client essentially deserved this enhanced security. But insofar as making an express request for an independent hearing during the trial, you're right, I did not do that. I'll concede that. But I would urge you to look at the reply brief because I did respond to Ms. Chowdhury's assertions in their opposing brief that, A, that there was some sort of admission or acknowledgement by my client, or B, that the record was not adequately developed with respect to our objection to the enhanced security. And on the harmless error issue, I've addressed that in our reply brief. Our point is that under the standards that docs adopted, if you have a diagnosis of gynecomastia and pain, which was evident on the record, then you're entitled to the surgery. I didn't need Nurse Northrup to testify to that because that was what Lester Wright, who was a deputy superintendent of docs, said in his responses to the interrogatories. The big question here is not, is the presence of armed guards prejudicial? The question here is, in the middle of a trial, after the client has been excused from the afternoon's proceedings because of illness, is it appropriate to then change the regime in such a dramatic and prejudicial way without allowing or without expecting that the jury is going to speculate and essentially come to the conclusion that this guy is really a bad dude and we're not going to give him any justice in this court. Thank you, counsel. Thank you both. I will reserve decision.